IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 07, 2014

**IN RE:  DESTINY M.**

**Direct Appeal from the Juvenile Court for McNairy County**
**No. 12JV48     Van McMahan, Judge**

---

**No. W2013-01802-COA-R3-PT - Filed February 24, 2014**

---

This is a termination of parental rights case.  Mother/Appellant appeals the trial court's termination of her parental rights on grounds of abandonment by an incarcerated parent pursuant to Tennessee Code Annotated Section 36-1-113(g)(1) as defined at Tennessee Code Annotated Section 36-1-102(1)(A)(iv), and persistence of conditions pursuant to Tennessee Code Annotated Section 36-1-113(g)(3).  Mother also appeals the trial court's determination that termination of her parental rights is in the child's best interest.  Because there is clear and convincing evidence in the record to support the trial court's decision, we affirm and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed
and Remanded**

J. STEVEN STAFFORD, J.,  delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Lisa M. Miller, Selmer, Tennessee, for the appellant, Beverly H.

Carma Dennis McGee, Savannah, Tennessee, for the appellees, Lavelle G. and Shasity M.

Melissa G. Stewart, Selmer, Tennessee, Guardian Ad Litem.

OPINION

## I. Background

The child at issue in this case, Destiny M., was born in September 2008, to Beverly H. ("Mother," or "Appellant").[1] The child's biological father died on December 14, 2010. The Juvenile Court of McNairy County became involved with this family in December 2010. At that time, Mother was arrested on drug charges. Temporary emergency custody was placed with the child's paternal grandmother, Lavelle G., and paternal aunt, Shasity M. (together with Lavelle G., "Appellees"). The technical record in this case does not contain the initial petition for custody, nor does it include the trial court's initial order, placing emergency custody with Appellees. Lavelle G. and Shasity M. live in separate homes, which are located on the same property. Although the child lives in Shasity M.'s home, Lavelle G. testified that she sees the child almost every day and keeps her at least two days per week.

Mother continued to incur criminal charges after the child was placed with Appellees. On January 3, 2011, she was charged with criminal trespass. Mother pled guilty to that charge on January 20, 2011, and received a sentence of thirty days incarceration, fines, and active probation; she was also ordered to undergo drug and alcohol evaluation and counseling. On March 1, 2011, Mother was arrested for promotion of methamphetamine manufacture and possession of Schedule II drugs. She pled guilty to those charges on May 13, 2011. On July 19, 2011, Mother was again arrested and charged with promotion of methamphetamine manufacture. On September 26, 2011, Mother pled guilty and received a sentence of two years, and active probation. On December 16, 2011, Mother was charged with assault, escape, and resisting arrest. On February 23, 2012, she pled guilty to those charges and received a sentence of fifty-eight days incarceration, and active probation. On May 11, 2012, an arrest warrant for Mother was issued for violation of her probation based upon the fact that she had reported to her parole officer while under the influence. Mother was incarcerated on July 7, 2012. By order of October 11, 2012, Mother was ordered to attend long-term rehabilitation for a "minimum period of six (6) months to one year." Consequently, Mother was incarcerated, either in jail or in court-ordered rehabilitation from July 7, 2012 through the date of the hearing, May 15, 2013.

An adjudicatory hearing was held on March 1, 2011. By order of March 16, 2011, the child was found to be dependent and neglected based upon Mother's stipulation that she was incarcerated at the time. Mother received supervised visitation with the child on Tuesdays and Saturdays, and daily telephone calls at 6:30 p.m. Mother's attorney was ordered to continue to represent her, and a guardian ad litem was appointed for the minor child. We note that the record in this case does not contain any information concerning the adjudicatory

---

[1] In termination of parental rights cases, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

hearing other than the March 16 order, which was admitted as Trial Exhibit 1.

On September 13, 2012, Appellees filed a petition to terminate Mother's parental rights. As grounds, Appellees alleged abandonment by an incarcerated parent pursuant to Tennessee Code Annotated Section 36-1-113(g)(1) as defined at Tennessee Code Annotated Section 36-1-102(1)(A)(iv), and persistence of conditions pursuant to Tennessee Code Annotated Section 36-1-113(g)(3). Mother filed her answer to the petition on October 15, 2012, and asked that the court dismiss the petition.

The case was heard on May 15, 2013. By order of July 11, 2013, the trial court terminated Mother's parental rights on the grounds of abandonment and persistence of conditions, and upon its finding that termination of Mother's parental rights was in the child's best interest. Mother appeals.

## II. Issues

Mother raises two issues for review as stated in her brief:

> 1. Whether there is clear and convincing evidence to support the trial court's finding that grounds existed for termination of Mother's parental rights to Destiny M.?
> 2. Whether the termination of Mother's parental rights was in the best interest of Destiny M.?

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn.1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174–75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36–1–113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

3

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky,* 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36–3–113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable ... and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn.2002). When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn.1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App.1997). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See id*.; *see also Walton v. Young*, 950 S.W.2d 956, 959 (Tenn.1997).

### IV. Grounds for Termination of Mother's Parental Rights
### A. Abandonment

Tennessee Code Annotated Section 36-1-113(g)(1) provides that termination of parental rights may be based upon the ground of "[a]bandonment by the parent or guardian, as defined in § 36-1-102. . . ." Tennessee Code Annotated Section 36-1-102(1)(A)(iv) defines abandonment, in relevant part, as follows:

> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has

4

willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tennessee Code Annotated Section 36-1-102 further provides that:

(B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;

(C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;

(D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child;

(E) For purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation;

(F) Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child; . . . .

In this case, the trial court made the following, specific findings concerning the ground of abandonment by willful failure to either visit or support:

The court finds by clear and convincing evidence in regard to [Mother] . . . that the child has been abandoned as defined in T.C.A. §36-1-102. The mother. . .was incarcerated at the time of the filing of the subject Petition to Terminate Parental Rights, which was filed on September 13, 2012. The Court finds that, for a period of four consecutive months immediately preceding her incarceration. . . [Mother] has both willfully failed to visit said child and has willfully failed to support or make reasonable payment toward the support of the child, and that any sporadic visits which may have taken place during that time are no more than token visitation.

*                              *                              *

Since the subject child was removed from her care in December 2010, [Mother], has paid no support for the benefit of the minor child. [Mother] has had the ability to support the child. She testified that during this time she has purchased cigarettes and other items, but that she has never paid any child support for the child. She further stated she did not believe that she should have been paying child support for the child because the child receives a check for survivor's benefit[s] from the Social Security Administration due to her biological father's death. She further stated that she thought that survivor's benefit[s] satisfied her child support obligation.

The subject Petition for Termination of Parental Rights was filed on September 15, 2012. [Mother] was incarcerated at that time, and has been incarcerated since July 7, 2012. For a period of four (4) consecutive months immediately preceding July 7, 2012 (that being March 7, 2012 through July 7, 2012), [Mother] was not incarcerated. [Mother] visited the child two (2) times during that four-month period, and called the child thirty-seven times during that four-month period. [Mother] further testified that she has only visited the child three (3) times since January 1, 2012. She testified that during this time she had purchased cigarettes rather than gasoline to use to visit her minor child. The Court finds that [Mother] further had the duty to support the child regardless of whether she was exercising visitation.

As an initial matter, we agree with the trial court's statement that Mother was required to support this child regardless of the payment of Social Security survivor's benefits. Tennessee Code Annotated Section 36-1-102(1)(H) states that "every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." A parent's obligation to support his or her child exists regardless of a court order requiring the parent to pay support. *See*, e.g.*, In re Shandajha A. G*., No. E2012-02579-COA-R3-PT, 2013 WL 3787594 (Tenn. Ct. App. July 17, 2013) As discussed by this Court in *State ex rel. Hayes v. Carter*, No. W2005-02136-COA-R3-JV, 2006 WL 2002577 (Tenn. Ct. App. July 6, 2006):

> It is well settled in Tennessee that biological parents must, as a general matter, support their children until they reach the age of majority. *See* T.C.A. § 34-1-102(a), (b) (2001); *Smith v. Gore*, 728 S.W.2d 738, 750 (Tenn.1987). Their support obligations are joint and several, and the extent of their obligations depends on their ability to provide support. . . . The parent's obligation to support, as well as the child's right to support, exist regardless of whether a court order exists, and regardless of whether the parents were ever married.

*Id.* at *2.

Appellee Lavelle G. testified that, since the child came into her custody in December 2010, Mother has provided no financial support. When questioned as to why she had not provided support for this child, Mother testified, in relevant part, that support "wasn't ordered because [the child] was receiving benefits through a check received from her father." Mother further testified that she draws $648 per month in Social Security disability, but that these funds had been suspended during her incarceration and court-ordered rehabilitation.

Concerning visitation with the child, Mother testified that Shasity M. had never interfered with her ability to speak with the child by telephone. In fact, Mother stated that, if she called and no one was home, Shasity M. "would call me back as soon as she could . . . ." However, Mother also admitted that she did not exercise all of the telephone contact that she was granted, explaining that she could not always use the telephone because of the rules at the facilities where she was incarcerated or where she was receiving rehabilitation. Although Mother acknowledged that she had been granted fairly liberal visitation with the child, she admitted that, since January 2012, she had only visited three times, and that the last visit was on or about March 31, 2012. Concerning her reason for missing visitation, Mother testified, in relevant part, that:

7

> The main reason I missed was due to incarceration or because
> I was sick or my mother didn't have the gas to take me to see her
> because when I didn't have the gas, I would have called my
> mother.

However, Mother admitted that she had bought cigarettes instead of gas on some of these occasions. In addition, Mother testified that she also missed some visitation because she was aware of the warrant that had been issued for her arrest, and she was concerned that if she exercised her visitation, she would be arrested and she did not want the child to see her be arrested.

Despite the fact that the Mother had the right to visit the child every other Friday evening and Saturday morning, for a total of four hours every other week, Shasity M., who supervised the visits, testified that none of the three visits Mother's exercised during the four month period proceeding her incarceration ever lasted more that two hours. In addition, Mother had the right to telephone calls with the child every night at 6:30. During the four months prior to her July 7, 2012 incarceration, the record indicates that Mother called the child only thirty-seven times, although she had the right to call her one-hundred-and-twenty times. As noted above, Mother justified her failure to exercise her visitation fully by stating that she was precluded under the rules of the facilities in which she was housed. We find her argument unpersuasive. In the case of *In re Keri C.*, 384 S.W.3d 731 (Tenn. Ct. App. 2010), as in the instant case, mother argued that her failure to visit was not willful because she was attempting to complete drug rehabilitation and parenting classes. In affirming the termination of mother's parental rights, this Court rejected that argument**:**

> Mother's final argument is that clear and convincing evidence
> did not establish that her failure to engage in more than token
> visitation with the child was willful under the circumstances.
> Mother bases this argument on the fact that she was "actively
> trying to complete the Court Ordered Safety plan by attending
> New Hope Recovery and attending parenting classes." In
> addition, just days before the termination petition was filed,
> Mother visited the Belchers for the purpose of informing them
> that she was attempting to accomplish the goals in the DCS
> safety plan so that she could petition the court for custody of
> Keri. This conduct, she argues, shows that she was "proactive in
> regaining custody of her child," and that the Belchers simply
> "won the race to the Courthouse steps." Mother argues, then,
> that the evidence of her conduct during the relevant period and
> the timing of the petition for termination are fatal to a finding of

willfulness.

\*                                    \*                                    \*

[The cases relied upon by mother] involved circumstances in which the child's custodians discouraged the biological parents from visiting the child and were, to some extent, responsible for the parents' failure to visit during the pertinent four-month period. In the instant case, the Belchers asserted, and Mother conceded, that the Belchers did not impede Mother's visitation. Rather, the Belchers welcomed Mother into their home, invited Mother to Keri's birthday party, invited Mother to lunch, and at times invited Mother to attend church with the family. Mother acknowledged that no one prevented her from visiting the child.

\*                                    \*                                    \*

[T]here is no evidence that Mother's attendance at the drug rehabilitation program at New Hope Recovery prevented her from visiting Keri during the pertinent four-month period. . . . Mother conceded in her testimony that she had a vehicle to enable her to visit Keri. Her failure to visit Keri outside of family gatherings, she admitted, was her own choice.

Thus, overall, there was no impediment to Mother's visits with Keri. Furthermore, Mother's statement to Mrs. Belcher that she planned to complete her tasks under the DCS safety plan and seek custody of her child after four months of only token visits with the child is not equivalent to actively seeking custody in the court system.

As we have stated, the "[f]ailure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." ***In re Adoption of Muir***, 2005 WL 3076896. Considering the record as a whole and the facts in this case, as found by the trial court and supported by a preponderance of the evidence, we agree with the trial court's holding that the proof establishes clearly and convincingly that Mother's failure to engage in more than token visitation with the child during the pertinent four-month

9

time period was willful.

*Id*. at 751-52.  Likewise, in the instant case, the record does not clearly and convincingly support Mother's contention that she was precluded from at least exercising her right to telephone contact with this child.  Mother's mother testified that Mother called her at least once or twice a week while she was in rehabilitation.  In addition, Shasity M. testified that she always made the child available for the daily telephone calls, a fact that Mother admitted in her own testimony.  In ***In re Keri C.***, this Court acknowledged that a parent's subjective intent and interest in the child is relevant, but that termination statutes generally require that such interest manifest in the form of objectively reasonable action geared toward establishing a healthy parent-child relationship.  *Id*. at 751.  In exercising only twelve percent or her visits, and only twenty-nine percent of the allowed telephone calls, it is clear that Mother's visitation was "token" at best.

Mother also argues that Shasity M. should have brought the child to see her in rehabilitation or should have allowed another family member to do so.  In the first instance, there is no indication in the record that Mother requested that either Lavelle G. or Shasity M. bring the child to the rehabilitation facility; moreover, there is no indication that they were required to do so by court order.  In ***In re M.L.P.***, 281 S.W.3d 387, 393 (Tenn. 2009), our Supreme Court stated that a "parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *Id*. (citing ***In re Audrey S.***, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005)).  There is simply no indication that the actions of Shasity M., Lavelle G., or any other person kept Mother from exercising her visitation.  In fact, the opposite appears to be true—that Shasity M. went out of her way to make sure that the child was available for visitation.

From the totality of the circumstances, we conclude that there is clear and convincing evidence in the record to support the trial court's finding that termination of Mother's parental rights was warranted on the ground of abandonment by an incarcerated parent for either willful failure to support or willful failure to visit in the four months immediately preceding her incarceration.

### B.  Persistence of Conditions

Tennessee Code Annotated Section 36-1-113(g)(3) further provides that termination of parental rights may be based upon persistence of conditions:

> (3) The child has been removed from the home of the parent or
> guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

In its order terminating Mother's parental rights, the trial court made the following findings concerning persistence of conditions:

> The Court further finds by clear and convincing evidence . . . that [Mother's] parental rights should be terminated due to persistence of conditions as defined in T.C.A. §36-1-113(g)(3). The child has been removed from the [Mother's] home by order of this Honorable Court for a period of more than six (6) months and the conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of mother still persist. There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the mother in the near future. The continuation of the parent and child relationship between the [Mother] and subject child greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

> *                    *                    *

> The minor child . . . was found to be a dependent and neglected child and custody of said child was removed from [Mother] by Order of this Court entered on March 16, 2011.

> *                    *                    *

> By Order of this Honorable Court entered on March 1,

11

2012, upon review of the case, permanent custody of the subject minor child was awarded to [Appellees]. [Mother] was incarcerated at the time of the hearing on charge of violation of probation in addition to new criminal charges. She further had no income at that time and her utilities to her residence had been cut off due to non-payment. . . . In said Order, [Mother] was ordered to remain drug free and complete her rehabilitation program. . . . The Court finds that [Mother] has not completed those requirements. She was arrested on July 7, 2012 for violation of her probation due to testing positive for cocaine and methamphetamine.

\*                                    \*                                    \*

Since December 2010, the conditions of [Mother] are still in existence as they were at the time of the removal of the child from her. [Mother] has been arrested and incarcerated eleven times since December 2010. She was incarcerated at the time of the adjudicatory and dispositional hearing in March 2011, and is incarcerated on the date of this termination hearing, although she is currently enrolled in an in-patient drug treatment program as an alternative to local incarceration. There is little likelihood that these conditions will be remedied in the near future. She has current criminal charges pending in the McNairy County Circuit Court for violation of her probation due to a failed drug test by her probation officer on May 2, 2012. She has numerous incarcerations in McNairy County, Tennessee, and has further undergone at least two drug rehabilitation programs at Lakeside and JACOA prior to the Cocaine Alcohol Awareness Program rehabilitation center that she is currently in. . . . The Court finds that, despite this, she has not made a lasting decision to correct her pattern of drug use and criminal acts. The Court further finds that the mother's actions have not spoken well for her.

The conditions that led to the removal of the child in this case are undisputedly Mother's drug use and incarceration. Melissa Price, Mother's "supervising officer" with the Tennessee Department of Correction Board of Probation and Parole, testified that even after the child was removed from her custody, Mother continued to engage in criminal activity and probation violations:

12

[Mother] was placed on probation in May of 2011 and in June of 2011, she [] violated [her probation] for receiving new charges of theft of services and possession of Schedule II drugs.

In June of [2011], she was revoked and reinstated and she was given 20 days shock incarceration so she was released in June back to probation and then in July of 2011, she again received new charges [for the promotion of methamphetamine], which violated her [probation]. . . . [Then a] violation in September where she did receive another two-year sentence on another meth case on state probation.

So she was released back to probation in September[, 2011] and then in December of that year again, she violated [her probation] again for receiving new charges, which were assault on a police officer, theft of property, burglary, resisting and escape.

And then moving on from that, she remained in violation until April of 2012. At that time, she was revoked and reinstated with her sentence to begin anew on her first case from 2011. It was–restarted over the sentence on that case, was started over so she started back on probation again in April and then May of 201[2], she was [in] violat[ion] again.

She had come here for a class that I had recommended to her. . . and I had gotten two complaints from two different employees here at the complex that she was under the influence so at that time I drug tested, and she was positive and signed a form[, which was admitted as Trial Exhibit 11,] admitting to drug use, which included Xanax, methamphetamine[, and cocaine.]

\*                          \*                          \*

At that time, I originated the violation of probation, and a warrant was issued for [Mother]. She was arrested on July [7], 2012 for her violation of probation, and she remained in jail until she was ordered to go to long-term treatment [in October, 2012].

Mother's continued violation of her probation during the period of time that the child has been removed from her physical custody clearly and convincingly indicates that the conditions which led to the child's removal still persist.

In addition, Mother is currently in long-term rehabilitation. Although we hope that Mother will avail herself of this opportunity, there is no indication in the record as to when she may complete the program as she was ordered to be in rehabilitation for a minimum of six months, and up to one year. Mother testified only that she was "about half way through" the program." From the record, it appears that Mother's addiction recovery has not advanced to the point where it could be considered complete. Moreover, the record indicates that Mother's previous attempts at rehabilitation have not been successful due to the fact that she left treatment early, and (according to her own admission) did not fully engage in the process.

Concerning her plans after she leaves rehabilitation, Mother will first have to complete the disposition of her two warrants for probation violations in McNairy County. Mother testified that she plans to move into a mobile home located on her family's property. Although she testified that the mobile home needs some work, she could not specify as to what repairs were needed, or who will fund such repairs. Furthermore, Mother was not able to say which of her family members actually owns the mobile home. Concerning income after release from the rehabilitation facility, Mother testified that she could not work because:

> I have two brain aneurisms. Right now, I might have to go into surgery. I'm not allowed to lift more than 14 pounds. They say there's a chance of paralyzation, they said bipolar, borderline schizophrenia. They said all that together was enough to approve my SSI.

Accordingly, Mother testified that she plans to live off her Social Security Disability payments. However, Mother's testimony concerning her health issues is not corroborated in the record. There was no proof presented concerning what, if any, of these ailments she is being treated for, or by whom.

From the totality of the circumstances, we conclude that the evidence clearly and convincingly establishes that many of the same conditions that led to the child's removal from Mother's custody still exist, or have not been remedied to such a degree or for such length of time as to indicate a permanent change on Mother's part.

### V. Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit upon establishment of a ground for termination of parental rights, then the interests of parent and child diverge. *In re Audrey S.*,

182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). The focus shifts to the child's best interest. *Id*. at 877. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). "The child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case at Tennessee Code Annotated Sections 36-1-113(i). These factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> \*                              \*                              \*
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable

15

manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877.

In its order, the trial court made the following findings concerning best interest:

In regard to the best interest of the child, this Court finds that the factors listed in T.C.A. §36-1-113(i) weigh in favor of termination of the rights of the mother . . . and that the termination of the mother's parental rights is in the best interest of the child. Specifically, the Court finds that the mother has no safe and stable home, and therefore, that there has been no adjustment of circumstances, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent pursuant to T.C.A. §36-1-113(i)(1). The mother stated that she has plans to live in a mobile home on a family member's property upon release from rehabilitation and upon that property being repaired. Further, the mother has failed to effect a lasting adjustment of her circumstances pursuant to T.C.A. §36-1-113(i)(2). The mother has not yet completed long-term drug rehabilitation, and is currently on her third attempt at rehabilitation since May 2012. She also still has pending criminal charges, and is incarcerated on the date of this hearing, just as she was when the child was removed from her custody and care in December 2012. The mother has not

16

maintained regular visitation or other contact with the child pursuant to T.C.A. §36-1-113(i)(3). At the time of the review hearing in January 2012, the Court found that the mother had exercised approximately twelve percent (12%) of the visits which she was entitled to since the prior court appearance in this matter and exercised approximately twenty-nine percent (29%) of the phone calls [to] which she was entitled. Since January 1, 2012, the mother has seen the child a total of only three (3) times, although she was out of jail from February 16, 2012 until July 7, 2012. The mother has never maintained regular visitation with the child even during the periods that she was not incarcerated.

The mother has not established a meaningful relationship with the child pursuant to T.C.A. §36-1-113(i)(4). Further, the change of caretakers and physical environment of the child is likely to have a negative effect on the child's emotional and psychological condition. The Court finds that tremendous weight should be given to the testimony in this matter given by [the child's therapist, Ms. Hawkes]. . . . She testified that the child has displayed symptoms of trauma during her treatment. She further testified that the child had a mother–child bond with. . . Shasity M[.], and that it was in the best interest of the subject child that the bond that the subject child has with her caregiver and custodian . . . be continued. The Court finds that it is in the best interest of the child that she remain with the [Appellees] and that the bond continue and that the child will be better cared-for with [them].

The Court finds that the mother has no safe and stable home, and therefore, the Court cannot determine the conditions of the home of the parent. . .pursuant to T.C.A. §36-1-113(i)(7). The Court further finds that the mother has never paid any support for the child pursuant to T.C.A. §36-1-113(i)(9).

Turning to the record, the child's therapist, Barbara Hawkes, who is a licensed clinical social worker, was qualified as an expert. She testified, in relevant part, that when the child first came to her after being removed from Mother's custody, the child exhibited signs of trauma, including "aggressive play," and sleep problems. However, during the two years (at that time) that the child had been in Appellees' custody, Ms. Hawkes stated that the child had progressed in a positive direction. Specifically, Ms. Hawkes stated that the child had "really made a good adjustment to where she was living [i.e., with the Appellees]. There was a lot

of family support, and I think [the child] felt comfortable. . . .”  Ms. Hawkes further stated that the child has bonded with Shasity M., and that the child considers Shasity M. to be her Mother.  On the other hand, Ms. Hawkes stated that the child has never “said anything about her biological mother, and [Ms. Hawkes] ha[s] never met [Mother]. . . .”  Because the child enjoys “stability and security where she is,” Ms. Hawkes opined that a change in custody at this point would be terribly detrimental to the child’s well being.

As discussed above, Mother has only exercised token visitation with this child, and has provided no support.  Shasity M. testified that (at the time of the hearing on May 15, 2013) Mother has seen the child only eleven times since the child came into Shasity M.’s custody in December 2010.  Concerning Mother’s living conditions, Shasity M. testified that she and Mother had talked about Mother’s living arrangements.  Most recently, Shasity M. stated that Mother had told her that she was living with a man, but Mother had told Shasity M. “that she was no longer living with him because he’s been incarcerated and she’s lost everything that she had . . . at his house because . . . it was busted for drugs and they took everything. . . .”

When the child came to live with Appellees, Shasity M. testified that the child “was afraid to be left in a room by herself,” and was “afraid that you were going to run out of gas when you got in the car.  She was scared that you didn’t have no [sic] money.”  Shasity M. also stated that the child was initially scared when she would see a police officer, and would indicate that she was “afraid they were going to take you.”  In addition, the child would fight with other children her age, and would engage in biting, hitting, and pulling hair to an extent greater than a normal child of her age.  However, Shasity M. stated that, since coming to live with her, the child had “thrived tremendously,” and that she now behaves like “a typical four-year-old.” Both Lavelle G. and Shasity M.’s sister Lenita G.’s testimonies corroborate Shasity M.’s testimony that the child had certain behavioral problems when she initially came into Appellees’ custody, but that since that time, her behavior had markedly improved.

At the time of the hearing, Mother admitted that her relationship with the child was “[n]ot as meaningful as I would like it to be.”  Mother opined that, given more time and counseling, the relationship could improve.  However, Mother admitted that it would not be in the child’s best interest to be separated from Shasity M.:

> I don’t believe that [i.e., separation from Shasity M.] would be in the best interest of my child at all because once she’s grown attached and has a bond with somebody, I mean, even the process of me—of her returning home with me, she needs to have that bond still with [Shasity M.].  I mean—or that would cause more drama and more dysfunctionality on her part.  She

18

don't [sic] need that. She needs to keep that bond and keep that closeness.

We agree with Mother's statement. It is apparent from the totality of the circumstances that this child has bonded with Shasity M. and Lavelle G. The child has found a stability and normalcy in their homes, which she has never known with Mother. Although we acknowledge Mother's attempts to attain sobriety, the record simply does not demonstrate that these changes have reached a level of success that would allow this child to be returned to Mother's care in the near future. Mother, herself, admits:

> I'm always going to be an addict, yes, but I'm a recovering addict and I'm always going to do my best, and I can't tell you what tomorrow holds. All I know is today alone, I know that I'm not going to use. . . .

Although this child has been out of Mother's custody since December 2010, at the time of the hearing in May 2013, Mother's sobriety was still in its nascency. Over this period, Mother has had numerous opportunities to improve her situation, but she has not made lasting adjustments to do so. As discussed in detail above, even after losing custody, Mother continued to engage in drug use and criminal activities. She has committed numerous violations of her probation, and has perpetuated the actions that led to the removal of the child in the first place. While we hope that Mother will use the opportunity afforded her through long-term treatment to make positive changes in her life, without proof that she has, in fact, made such changes permanently, it would not be in the child's best interest to remove her from Appellees' custody on the hope that Mother will become able to care for the child in a stable and permanent way. This is especially true in light of the undisputed fact that the child has bonded with Appellees and that she has flourished while in their care. It is clearly in the child's best interest to continue her present situation, and termination of Mother's parental rights will facilitate the child's full integration with Appellees at the earliest possible date. As Mother stated:

> Q. How long do you think [the child] should have to wait for some stability in her life? I mean, it's been two and a half years. Don't you think she deserved it before now?
>
> A. Of course she deserves it and yeah, I do believe so, but I'm sorry as a failing mother that it took me this long to actually get serious and no, that's no fault of hers and no, she shouldn't have to wait on me this long. She shouldn't because she deserves so much better.

19

From the totality of the circumstances, we conclude that there is clear and convincing evidence in the record to support the trial court's finding that termination of Mother's parental rights is in this child's best interest.

## VI. Conclusion

For the foregoing reasons, we affirm the order of the trial court, terminating Mother's parental rights. The case is remanded for such further proceedings as may be necessary and are consistent with this Opinion. Costs of the appeal are assessed against Mother. Because Mother is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____

J. STEVEN STAFFORD, JUDGE
